**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| Encore Wealth Investments Limited | Civil Case No.: |
| Plaintiff | |
| v. | |
| Jiangsu Saleen Automotive Technology Co., Ltd. | |
| and | |
| Nantong Jiahe Science and Technology Investment and Development Company Limited | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Encore Wealth Investments Limited ("EWI" or "Plaintiff"), for its Complaint against Defendants Jiangsu Saleen Automotive Technology Co., Ltd. ("JSAT") and Nantong Jiahe Science and Technology Investment and Development Company Limited ("Nantong Jiahe") (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

1.     This action arises out of Defendants' wrongful appropriation, retention, and exploitation of Plaintiff's equity interest in JSAT and Plaintiff's intellectual property in valuable electric vehicle ("EV") technologies. These technologies were originally developed and owned by WM Industries Corp. ("WMI") and its subsidiary GTA Automotive Inc. ("GTA") in Virginia, subsequently acquired by Plaintiff in Virginia bankruptcy proceedings.

2.     Nantong Jiahe negotiated and secured a joint venture agreement ("JVA") under

1

which WMI would contribute its proprietary EV intellectual property, including a technology known as "MyCar" EV technology, as a non-cash capital contribution to a newly formed Chinese joint venture, JSAT, in exchange for an 11.07 percent equity stake given to GTA's wholly owned subsidiary, Rugao GreenTech Automotive Co., Ltd. ("Rugao GreenTech"). A Chinese state-owned appraisal firm to valued WMI's EV intellectual property at 1,106,920,000 Chinese Yuan (approximately 159 million U.S. dollars), a valuation that was independently confirmed by two additional state-owned appraisers and by Defendants' own appointed auditors. On the strength of that valuation, WMI received a documented 11.07 percent equity interest in JSAT as core consideration for its contribution of the MyCar EV and related EV technology. Defendants thus expressly acknowledged both the enormous economic value of the EV technology and the legitimacy of the 11.07 percent stake in JSAT belonging to WMI and, later, to Plaintiff.

3.      WMI and GTA later entered bankruptcy proceedings in Virginia where Plaintiff was the largest creditor of WMI and GTA. Plaintiff paid 8 million U.S. dollars and forgave a 52-million-dollar loan in a court approved asset sale, where as a result it acquired all WMI and GTA assets, including its 11.07 percent equity interest in JSAT. Plaintiff thus stepped squarely into WMI's and GTA's shoes, owning both the trade secrets and the equity stake that embodied the negotiated consideration for their transfer.

4.      Fueled by the EV technology contribution, JSAT rapidly achieved spectacular growth. Capitalized at 10 billion Chinese Yuan and incorporating WMI's EV intellectual property, JSAT constructed a one-million-square-meter manufacturing facility in Rugao, China, implemented Plaintiff's EV technology in production by 2019, and attained a 30 billion Chinese Yuan (approximately 4.3 billion U.S. dollars) valuation, ranking No. 265 among the Global Top 500 Unicorn Enterprises. At that point, Plaintiff's 11.07 percent equity interest, which directly

reflected the appraised value of its contributed technology, was worth approximately 476.47 million U.S. dollars. Defendants then subsequently stripped Plaintiff of its 11.07 percent ownership interest in JSAT without any compensation, misappropriating Plaintiff's trade secrets, and retaining for themselves the full value of a multi-billion-dollar automotive enterprise built on Plaintiff's intellectual property contributions.

5. After Defendants had fully absorbed Plaintiff's technology and used it as a core asset to elevate JSAT into a unicorn-valued automaker, they executed a calculated takeover. In or about April 2020, when U.S. executives were barred from traveling to China, Defendants initiated a series of maneuvers to nationalize JSAT, seizing control of its management and operations by police force, effectively wiping out Plaintiff's 11.07 percent equity interest held through WMI's wholly owned subsidiary Rugao GreenTech, and excluding Plaintiff from any governance, distributions, or access, all without any compensation to Plaintiff. Defendants have since operated JSAT using Plaintiff's proprietary EV technology, retaining for themselves the entirety of the enterprise value that Plaintiff's contributions helped create.

6. Defendants ignored Plaintiff's repeated demands, refused to restore or compensate Plaintiff for its 11.07 percent shareholding, and continued to exploit both Plaintiff's equity and trade secrets while treating JSAT as if it were wholly their own. As a result, Plaintiff pursued arbitration against Defendants in Hong Kong.

7. After a four-year Hong Kong arbitration commenced in 2020, the arbitral tribunal determined the value of the MyCar EV technology contributed to JSAT at 1,106,920,000 Chinese Yuan. However, the arbitral panel refused to acknowledge Plaintiff had standing to assert its rights in arbitration proceedings pursuant to the JVA.

8. Despite the adjudicated valuation of the MyCar technology, Defendants ignored

Plaintiff's demands, continued to exclude Plaintiff from JSAT, and retained the full value of Plaintiff's contributions while erasing Plaintiff's equity.

9.　　Defendants' conduct constitutes, inter alia, unjust enrichment, misappropriation of trade secrets under the Defend Trade Secrets Act, non-permissible change of position under equitable estoppel, breach of fiduciary duty, breach of contract, breach of the implied warranties of good faith and fair dealing, and conversion of equity and intellectual property interests. Plaintiff seeks restitution of the value of its contributions and equity, damages for misappropriation under the Defend Trade Secrets Act, breach of fiduciary duty, breach of contract, conversion, and other related relief.

## PARTIES

9.　　Plaintiff EWI is a company organized under the laws of the British Virgin Islands. It was the largest creditor of WMI and GTA, and acquired all assets of WMI and GTA, including Rugao GreenTech and its equity interest in JSAT, through Virginia bankruptcy proceedings.

10.　　Defendant Jiangsu Saleen Automotive Technology Co., Ltd. ("JSAT") is a Chinese limited liability company located in Rugao, Jiangsu Province, China formed in 2016 as a joint venture between WMI and Nantong Jiahe.

11.　　Defendant Nantong Jiahe Science and Technology Investment and Development Company Limited ("Nantong Jiahe") is a state-owned enterprise located in Rugao City, Jiangsu Province, China, serving as the professional investment company for the Rugao Municipal Government. Nantong Jiahe was WMI's joint venture counterparty and the controlling shareholder of JSAT.

## JURISDICTION AND VENUE

12.　　This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2), as the

amount in controversy exceeds 75,000 U.S. dollars, exclusive of interest and costs, and is between a foreign plaintiff, a British Virgin Islands Company, and foreign defendants, both of which are Chinese entities.

13. Pursuant to 18 USCS § 1831, and 28 USCS § 1331, this Court has subject-matter jurisdiction over the federal trade secret misappropriation claims asserted herein.

14. This Court has personal jurisdiction over Defendants, as Defendants purposefully availed themselves to Virginia's courts by soliciting WMI in Fairfax County, conducting due diligence there, and inducing the transfer of the MyCar IP developed in Virginia by a company registered to do business in Virginia.

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (c), because a substantial part of the events giving rise to the claims occurred in this District, and because Defendants are subject to the Court's personal jurisdiction in this District.

## FACTS

### *Solicitation of WMI and GTA in Virginia*

16. In December 2015, a delegation led by the then mayor of Rugao city, other Rugao government officials, decision-makers of Nantong Jiahe, and the future chairman of JSAT traveled to Fairfax, Virginia. The purpose of the visit was to solicit the business of WMI, and the delegation conducted due diligence on GTA's EV products and technology.

17. Following this due diligence, Defendants negotiated the terms of a joint venture under which Defendants would provide all funding to build an automotive manufacturer in China and WMI would provide its Electric Vehicle intellectual property, including the MyCar EV technology, as a capital contribution.

18.  In early January 2016, Nantong Jiahe executives and Rugao officials called WMI's Chairman and CEO in Virginia, informed him that the joint venture had received government approval, and urged him to travel to China to sign a joint venture agreement.

### *Joint Venture Formation and WMI's Technology Contribution*

19.  In March of 2016, WMI and Nantong Jiahe entered into the JVA under which WMI contributed its EV intellectual property, including the MyCar EV technology, to JSAT at a valuation of 1,106,920,000 Chinese Yuan.

20.  In exchange, WMI received an 11.07 percent equity interest in JSAT, via WMI's wholly owned Chinese subsidiary Rugao Green Tech Automotive which was capitalized at 10 billion Chinese Yuan.

21.  A Chinese state-owned appraisal company valued WMI's EV intellectual property at 1,106,920,000 Chinese Yuan (approximately 158,812,052 U.S. dollars). Two other Chinese government-owned appraisers independently verified this valuation, and Defendants' appointed accounting and auditing firm audited it.

22.  Based on this valuation, WMI (through Rugao GTA) received an 11.07 percent equity share in JSAT. The remaining equity was held by Nantong Jiahe or its affiliates and other investors.

23.  Defendants agreed that disputes under the JVA would be resolved by binding arbitration in Hong Kong.

### *JSAT's Growth Using Plaintiff's Technology*

24.  Capitalized with 10 billion Chinese Yuan and incorporating WMI's EV technology, JSAT embarked on construction of an advanced manufacturing facility in Rugao, China.

25.  JSAT officially implemented WMI's EV technology for producing vehicles in 2019.

26. By December 2019, using Plaintiff's technology as a core asset, JSAT completed a 1 million square meter manufacturing facility, installed 470 robotics, achieved 97 percent automation, began production of vehicles based on Plaintiff's EV technology, and attained an enterprise valuation of 30 billion Chinese Yuan (approximately 4.3 billion U.S. dollars), ranking No. 265 among the Global Top 500 Unicorn Enterprises.

27. Plaintiff's 11.07 percent equity interest in JSAT would thus have been worth approximately 476.47 million U.S. dollars at that time.

### *Plaintiff's Acquisition of WMI's Assets and JSAT Equity*

28. In 2017, WMI and GTA filed for bankruptcy in Virginia. Plaintiff was their largest creditor, holding a 52-million-dollar unpaid loan.

29. Through a court-approved bankruptcy sale, Plaintiff paid an additional 8 million U.S. dollars to acquire all assets of WMI and GTA, including its 11.07 percent equity interest in JSAT.

30. As a result, Plaintiff became the successor to WMI/GTA, owning the 11.07 percent JSAT equity interest, as well as the intellectual property in the underlying EV technology originally contributed by WMI and GTA to JSAT.

### *Defendants' Nationalization and Expropriation of Plaintiff's Equity*

31. In April 2020, when U.S. executives were grounded by Covid-19 travel bans and could not travel to China, Defendants started a series of illegal maneuvers to nationalize JSAT.

32. Defendants' actions included: Seizing control over JSAT's management and operations by removing a board member; wiping out the 11.07 percent equity interest held through Rugao GreenTech without compensation; and continuing to operate and control JSAT and its assets, including Plaintiff's contributed technology, for Defendants' own benefit.

7

33. Despite Plaintiff's multiple requests asserting its equity rights in JSAT, Defendants ignored Plaintiff's multiple requests regarding its equity interest in JSAT and went on to wipe out Plaintiff's interest in JSAT.

34. Defendants have retained all benefits of Plaintiff's contributed technology and equity interest, including JSAT's multi-billion-dollar valuation and its advanced manufacturing facilities, while unlawfully excluding Plaintiff from ownership and profits.

35. By December 2019, JSAT's valuation had risen to 30 billion Chinese Yuan, making Plaintiff's 11.07 percent share worth approximately 476.47 million U.S. dollars. Plaintiff's 11.07 percent share of the original 10 billion Chinese Yuan capitalization would be worth approximately 159 million U.S. dollars.

36. In August of 2020, Plaintiff pursued arbitration in good faith against Defendants. The arbitral tribunal was initially asked to decide as to whether Plaintiff had standing to assert its rights in proceedings under the JVA, but the panel declined to issue such decision as Plaintiff's standing was too intertwined with the substantive issues of the claim. Ultimately the arbitral panel decided that Plaintiff did not have standing pursuant to the JVA.

## COUNT I

**UNJUST ENRICHMENT**
**(Against Both Defendants)**

37. All previous paragraphs are incorporated herein.

38. Under Virginia common law, unjust enrichment (or quasi-contract) arises when (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value, under circumstances that make retention inequitable. See Schmidt v. Household Fin. Corp., II, 661 S.E.2d 834, 838 (Va. 2008).

39.    The mere presence of a contract does not preclude a claim of unjust enrichment where the benefit conferred and retained lies outside the scope of enforceable contractual remedies, and where retention would be inequitable. See James G. Davis Constr. Corp. v. FTJ, Inc., 841 S.E.2d 642, 648 (Va 2020).

40.    Plaintiff, through its predecessor WMI and subsidiary GTA, conferred substantial benefits upon Defendants, including: Transfer of valuable EV intellectual property, specifically the MyCar EV technology, valued by state owned Chinese appraisers and Defendants' own auditors at 1,106,920,000 Chinese Yuan; Capitalization of JSAT through this non cash contribution, which was integral to JSAT's ability to raise capital, build its manufacturing facility, and commence production; An 11.07 percent equity stake in JSAT, which connected the value of Plaintiff's contributions to JSAT's growth and ultimate 30 billion Chinese Yuan valuation.

41.    JSAT knowingly accepted and used Plaintiff's technology as a core capital contribution, incorporated it into its assets and operations, and relied upon it to achieve production and unicorn level valuation.

42.    Nantong Jiahe, as the state owned joint venture partner and controlling shareholder, also accepted the benefits of Plaintiff's contributions by (a) using Plaintiff's technology and share capital to build JSAT; (b) raising and providing additional capital; and (c) later consolidating control over JSAT and Plaintiff's contributed value when it nationalized the company.

43.    The Hong Kong tribunal's arbitral decision acknowledging the value of the EV technology contributed to Defendants at 1,106,920,000 Chinese Yuan confirms the reality and magnitude of the benefit conferred and retained.

9

44.    Defendants knew that Plaintiff and its predecessors expected to receive and retain an 11.07 percent equity interest in JSAT as compensation for their contributions and to share in JSAT's future growth and profits.

45.    By unilaterally nationalizing JSAT in April 2020, wiping out Plaintiff's equity, and ignoring the arbitral valuation of Plaintiff's technology in 2024, Defendants have retained the full benefit of Plaintiff's technology and corresponding equity value without paying Plaintiff.

46.    Defendants' retention of these benefits without compensation is inequitable, particularly given their solicitation of WMI's technology in Virginia, use of state owned appraisers and auditors to legitimize the transaction, subsequent expropriation during the Covid-19 travel ban.

47.    Plaintiff has no adequate remedy at law that fully compensates it for Defendants' unjust retention of the value of Plaintiff's contributions and equity interest, particularly given Defendants' efforts to erase Plaintiff's ownership rights while preserving and exploiting the underlying assets.

48.    Plaintiff is therefore entitled to restitution in an amount equal to the value of the benefits unjustly retained. Such value is calculated at 476.47 million U.S. dollars (11.07 percent of JSAT's 30 billion valuation Chinese Yuan at the time of takeover), or at minimum 159 million U.S. dollars (11.07 percent of the original 10 billion Chinese Yuan capitalization), plus interest.

### <u>COUNT II</u>

**BREACH OF THE DEFEND TRADE SECRETS ACT ("DTSA") THROUGH MISAPPROPRIATION OF TRADE SECRETS (18 USC §§ 1831 et seq.)**
**(Against Both Defendants)**

49.    All previous paragraphs are incorporated herein.

50.    Pursuant to 18 USCS § 1836(b), an owner of a trade secret that is misappropriated may bring a civil action under the DTSA if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 USCS § 1836(b)

51.    Plaintiff is the owner of the trade secrets at issue within the meaning of 18 USCS § 1839, because through the Virginia bankruptcy proceedings it acquired all right, title, and interest in the EV intellectual property originally developed and owned by WMI and its subsidiary GTA, including the MyCar EV technology and all related EV technology that WMI and GTA contributed to JSAT as capital. See 18 USCS § 1839.

52.    The EV intellectual property contributed by WMI and GTA, including, without limitation, the MyCar EV technology and associated designs, technical know-how, methods, processes, and engineering information, constitutes "trade secrets" under 18 USCS § 1839.

53.    These trade secrets consist of scientific, technical, and engineering information, including designs, prototypes, methods, techniques, processes, procedures, programs, and codes, whether tangible or intangible and whether stored physically or electronically. WMI and GTA developed this technology in Virginia, did not disclose it to the general public, and contributed it to JSAT as highly valuable, proprietary EV technology rather than as public-domain know-how, and Plaintiff acquired the same in the Virginia bankruptcy sale.

54.    The EV trade secrets at issue derive independent economic value, actual and potential, from not being generally known to, and not readily ascertainable through proper means by, other persons who could obtain economic value from their disclosure or use, within the meaning of 18 USCS § 1839. A Chinese state-owned appraisal firm valued WMI's EV intellectual property at 1,106,920,000 Chinese Yuan (approximately 159 million U.S. dollars), and two additional state-owned appraisal firms and Defendants' own appointed auditors

independently confirmed this valuation, demonstrating the substantial economic value of the proprietary EV technology and know-how transferred.

55.    The Hong Kong arbitral tribunal later determined the value of the MyCar EV technology which had been transferred to JSAT at 1,106,920,000 Chinese Yuan, further confirming the substantial and independent economic value of the MyCar EV trade secrets.

56.    WMI and GTA took reasonable measures to keep the EV technology, including the MyCar EV technology, secret within the meaning of 18 USCS § 1839(3)(A). The technology was developed internally in Virginia, treated as proprietary intellectual property, and transferred to JSAT only as a non-cash capital contribution under the JVA, at a defined royalty-like valuation, in exchange for an 11.07 percent equity stake. It was not made publicly available but instead was contributed under transaction documents and appraisals that recognized it as valuable proprietary EV technology, not open-source information.

57.    Plaintiff then purchased all of WMI's and GTA's assets, including this EV intellectual property and the resulting 11.07 percent JSAT equity, through a court-approved bankruptcy sale in Virginia, confirming that the technology was treated as a discrete, ownable intellectual property asset.

58.    The EV trade secrets are related to products used in interstate and foreign commerce. JSAT used the contributed EV technology to construct and operate a 1-million-square-meter, highly automated automobile manufacturing facility in Rugao, China, and to produce electric vehicles based on Plaintiff's technology. The EV technology was used in products intended for and used in interstate and foreign commerce within the scope of 18 USCS § 1836(b)(1).

12

59.　Under 18 U.S.C. § 1839(5), "misappropriation" includes (a) acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by "improper means" and (b) disclosure or use of a trade secret without consent by a person who used improper means to acquire it or who knew or had reason to know, at the time of use, that the trade secret had been acquired or was being retained under circumstances giving rise to a duty to maintain its secrecy or limit its use.18 USCS § 1839 "Improper means" includes, without limitation, theft, misrepresentation, and breach or inducement of a breach of a duty to maintain secrecy, as provided in 18 USCS § 1839(6).

60.　Plaintiff, as successor to WMI and GTA, consented to a limited and conditioned use of its trade secrets: WMI contributed its EV technology to JSAT as a non-cash capital contribution under the JVA in exchange for an 11.07 percent equity interest in JSAT, to be held through Rugao GreenTech, WMI's wholly owned subsidiary.

61.　Defendants solicited this proprietary technology in Fairfax, Virginia, where Rugao municipal officials and executives of Nantong Jiahe visited in December 2015 to solicit the business of WMI, conducted due diligence on GTA's EV products and technology, and then negotiated the JVA under which WMI would provide its proprietary EV technology as a capital contribution and Defendants would provide funding and equity recognition.

62.　Under the JVA and related corporate documents, Defendants knew that Plaintiff's and its predecessors' trade secrets were being provided as a defined capital contribution with a mutually recognized value of 1,106,920,000 Chinese Yuan, and that WMI and later Plaintiff would own and maintain an 11.07 percent equity interest in JSAT as the core consideration for the transfer and use of those trade secrets. These circumstances gave rise to duties of confidentiality and limitations on use: Defendants were obligated to use the EV technology only

13

within the joint venture structure while honoring Plaintiff's equity and ownership rights, and not to expropriate the trade secrets or the equity embodying their value.

63.　　Defendants misappropriated Plaintiff's trade secrets within the meaning of 18 USCS § 1839(5) by using and continuing to use Plaintiff's EV trade secrets without consent and in breach of the duties and conditions under which they were acquired. In or about April 2020, during the Covid-19 pandemic and associated travel bans that prevented U.S. executives from traveling to China, Defendants initiated "a series of illegal maneuvers to nationalize JSAT," including: seizing control over JSAT's management and operations; effectively wiping out the 11.07 percent equity interest held through Rugao GreenTech (now owned by Plaintiff) without compensation; and continuing to operate and control JSAT and its assets, including Plaintiff's contributed technology, solely for Defendants' own benefit.

64.　By unilaterally expropriating Plaintiff's equity and excluding Plaintiff from corporate governance and economic rights while retaining and exploiting the EV trade secrets in JSAT's operations, Defendants exceeded and violated the scope of any prior consent and breached duties to maintain the secrecy and limited, joint-venture-based use of the technology.

65.　　Defendants' ongoing use of Plaintiff's EV trade secrets after the April-2020 nationalization constitutes "use" and "disclosure" of trade secrets without express or implied consent under 18 USCS § 1839(5)(B). JSAT incorporated the MyCar EV technology and other WMI/GTA technology into its manufacturing operations and vehicles as a core asset, maintaining a multi-billion-dollar valuation and advanced manufacturing facilities built on Plaintiff's proprietary technology, while unlawfully excluding Plaintiff and repudiating the equity and contractual framework that accompanied the original transfer.

14

66.     Defendants' misappropriation was carried out through "improper means" under 18 USCS § 1839(6), including misrepresentation, breach, and inducement of breach of duties to maintain secrecy or limit use. Defendants originally induced WMI and GTA to transfer their trade secrets into JSAT by promising a secured 11.07% equity stake and a continuing role in the joint venture, supported by multiple state-owned appraisals and Defendants' own auditors confirming a 1,106,920,000 Chinese Yuan valuation. Having obtained and integrated the trade secrets and used them to build JSAT's facility and valuation, Defendants then orchestrated a unilateral nationalization during a period when Plaintiff's representatives were unable to travel to China, erased Plaintiff's ownership interest, ignored Plaintiff's demands asserting its equity and technology rights, and retained all benefits of the EV trade secrets for themselves. This course of conduct constitutes improper means within the meaning of 18 USCS § 1839.

67.     Defendants knew or had reason to know at all times that their retention and use of Plaintiff's EV technology after wiping out Plaintiff's equity and ignoring Plaintiff's demands were unauthorized and in breach of their duties. Defendants were intimately involved in the negotiations of the JVA in Fairfax, Virginia, in the state-owned appraisals of the EV technology, and in the corporate documents reflecting Plaintiff's 11.07 percent equity interest. The subsequent Hong Kong arbitration determining the value of the MyCar EV technology at 1,106,920,000 Chinese Yuan gave Defendants further actual notice of Plaintiff's ownership and the value of the underlying trade secrets; yet Defendants still refused to restore or compensate Plaintiff while continuing to exploit the technology. Under 18 U.S.C. § 1839(5)(B)(ii)–(iii), Defendants thus disclosed and used the trade secrets knowing that they were obtained and retained in violation of duties of secrecy and limited use.

68.    Defendant Nantong Jiahe is a state-owned enterprise serving as the professional investment company for the Rugao Municipal Government, and Defendant JSAT is a Chinese limited liability company formed in 2016 as a joint venture between WMI and Nantong Jiahe, with Nantong Jiahe as controlling shareholder. As a state-owned enterprise and a company substantially owned, controlled, and dominated by a foreign government entity, these Defendants constitute or act through a "foreign instrumentality" within the meaning of 18 USCS § 1839(1), because they are legal, commercial, or business organizations substantially owned or controlled by a foreign government. Their misappropriation of Plaintiff's trade secrets thus falls squarely within the foreign-focused concerns of the DTSA.

69.    Defendants' misappropriation was willful and malicious within the meaning of 18 USCS § 1836(b)(3)(C). Defendants intentionally solicited Plaintiff's predecessor's EV technology in Virginia, induced its transfer into a Chinese joint venture by promising an equity stake and honoring appraised value, and then, once the technology had been fully integrated and JSAT's value had dramatically increased, executed a calculated nationalization during the Covid-19 travel ban to eliminate Plaintiff's ownership while retaining and exploiting the technology. Defendants then ignored Plaintiff's repeated demands and the Hong Kong arbitral determination of the value of Claimant's shareholding based on the MyCar EV technology, continuing to operate JSAT and profit from the technology without any compensation to Plaintiff. This deliberate expropriation of Plaintiff's trade secrets and the associated equity value, in the face of clear knowledge of Plaintiff's rights and repeated assertions of those rights, constitutes willful and malicious misappropriation.

70.    As a direct and proximate result of Defendants' misappropriation of Plaintiff's trade secrets, Plaintiff has suffered substantial damages, including but not limited to: (a) loss of

the fair market value of its 11.07 percent equity interest in JSAT, which, at JSAT's December-2019 valuation of 30 billion Chinese Yuan, was approximately 476.47 million U.S. dollars; and (b) at minimum, loss of the original 1,106,920,000 Chinese Yuan (approximately 159 million U.S. dollars) capitalized value of the contributed EV technology and corresponding equity, plus additional damages for unjust enrichment arising from Defendants' continued unauthorized use of the technology in JSAT's operations and enterprise value.

71.    Pursuant to 18 USCS § 1836(b)(3)(A)–(B), Plaintiff is entitled to recover damages for its actual loss and for any unjust enrichment not addressed in computing actual loss, or, in the alternative, a reasonable royalty for Defendants' unauthorized disclosure or use of Plaintiff's trade secrets. Given Defendants' willful and malicious misappropriation, Plaintiff is entitled to exemplary damages in an amount not more than two times the amount of damages awarded under 18 USCS § 1836(b)(3)(B). Plaintiff is also entitled to recover its reasonable attorneys' fees and costs as the prevailing party under 18 USCS § 1836(b)(3)(D).

72.    In addition, under 18 USCS § 1836(b)(3)(A), Plaintiff is entitled to appropriate injunctive and equitable relief to prevent any actual or threatened further misappropriation, including but not limited to orders requiring Defendants to cease using Plaintiff's EV trade secrets, to take affirmative steps to protect those trade secrets, and, in exceptional circumstances, to condition any further use on payment of a reasonable royalty for no longer than the period for which such use could have been prohibited. Such injunctive and equitable relief is necessary to prevent future misappropriation and further irreparable injury.

## COUNT III

### EQUITABLE ESTOPPEL
### (Against Both Defendants)

73.    All previous paragraphs are incorporated herein.

17

74.    Under Virginia law, a claim for equitable estoppel requires, (1) a representation, (2) reliance, (3) a change of position, and (4) detriment. Cowan v. Psychiatric Assocs., Ltd., 387 S.E.2d 747, 749 (1990).

75.    Defendants, through their negotiations, appraisals, and joint venture documents, made clear and definite representations that WMI/GTA, and later Plaintiff as successor, would hold and enjoy an 11.07 percent equity interest in JSAT in return for contributing EV technology valued at 1,106,920,000 Chinese Yuan.

76.    Plaintiff and its predecessors reasonably relied on those promises by transferring technology, foregoing other opportunities, and allowing Defendants to use that technology and associated goodwill to build JSAT's business.

77.    Plaintiff and its predecessors changed its position based on these representations by transferring technology, foregoing other opportunities, and allowing Defendants to use that technology and associated goodwill to build JSAT's business; additionally, Plaintiff's acquisition of WMI/ GTA was based on the equity interest of JSAT.

78.    Plaintiff and its predecessor's reliance was to their detriment, as WMI/ GTA sacrificed other business opportunities to join the joint venture with Defendants.

79.    Defendants now deny or frustrate those representations by erasing Plaintiff's equity and refusing to recognize or compensate Plaintiff despite JSAT's multi-billion-dollar valuation and the arbitral award fixing the value of Plaintiff's intellectual property.

80.    Injustice can be avoided only by estopping Defendants from denying Plaintiff's equity rights or the value of its contributions and by granting appropriate monetary and equitable relief to restore Plaintiff to the position it would have occupied had Defendants honored their promises.

## COUNT IV

### BREACH OF FIDUCIARY DUTY
### (Against Nantong Jiahe)

81.     All previous paragraphs are incorporated herein.

82.    The elements of a claim for breach of fiduciary duty are (1) duty, (2) breach, and (3) damages. See Nassabeh v. Montazami, 101 Va. Cir. 151, 162 (Cir. Ct. 2019) (stating, "The elements of a claim for breach of fiduciary duty are the same as any other claim sounding in tort: (1) duty, (2) breach, and (3) damages.").

83.    A fiduciary duty arises where special confidence is reposed in one who, in equity and good conscience, must act for the benefit of another. See Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 295 (Va. 2007) (stating "A fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence.").

84.    As majority shareholder and controlling party, Nantong Jiahe owed fiduciary duties to minority shareholder, Plaintiff and its predecessors, as Plaintiff reposed confidence in Defendants to honor the MyCar IP contributions of WMI/ GTA.

85.     By orchestrating the cancellation of Plaintiff's shares, seizing control of assets, and refusing to compensate Plaintiff for the intellectual property contributions of its WMI/GTA, Nantong Jiahe breached those duties.

86.    Plaintiff was thereby damaged in the amounts of 476.47 million U.S. dollars.

## COUNT V

### BREACH OF CONTRACT
### (Against Both Defendants)

87.    All previous paragraphs are incorporated herein.

88.    Under Virginia law, the elements of a claim for breach of contract are: (1) a legally

enforceable contractual obligation of the defendant to the plaintiff; (2) the defendant' breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach. See Filak v. George, 594 S.E.2d 610, 614 (Va. 2004).

89.    WMI and Nantong Jiahe entered into the JVA in March 2016 to form JSAT and to define the parties' respective capital contributions, equity interests, and shareholder rights. WMI contributed EV technology in exchange for an 11.07 percent equity interest; Nantong Jiahe and other Chinese entities contributed cash and other assets.

90.    Plaintiff acquired all of WMI's rights and assets, including WMI's interest in Rugao GTA and corresponding 11.07 percent JSAT equity interest, through a court-approved bankruptcy sale in Virginia. Plaintiff thereby succeeded to WMI's contractual rights associated with that equity interest under applicable assignment and succession law.

91.    The JVA and associated corporate documents created enforceable obligations requiring Defendants to honor the 11.07 percent equity interest corresponding to the 1,106,920,000 Chinese Yuan technology contribution and to refrain from expropriating or nullifying that interest without lawful basis or compensation.

92.    By nationalizing JSAT in April 2020, erasing or "wiping out" Plaintiff's 11.07 percent equity interest, and refusing to recognize or restore Plaintiff's shareholding even after the arbitral award, Defendants breached their contractual obligations to respect and protect Plaintiff's equity and corresponding rights.

93.    As a direct and proximate result of these breaches, Plaintiff has suffered damages of at least 476.47 million U.S. dollars, representing the fair value of its 11.07 percent interest at the time of the takeover, or alternatively 159 million U.S. dollars representing the capitalized value of that interest, plus lost profits, distributions, and other damages, with interest.

20

## COUNT VI

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Nantong Jiahe)**

94.    All previous paragraphs are incorporated herein.

95.    Under Virginia law, every contract carries an implied covenant of good faith and fair dealing in the performance and enforcement of the contract, prohibiting a party from exercising contractual discretion in bad faith or in a manner that deprives the other party of the fruit of the bargain. Citing. Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co., 506 F. Supp. 3d 360, 381 (E.D. Va. 2020).

96.    The JVA and related agreements required Nantong Jiahe, as state-owned partner and controlling shareholder, to perform its obligations in a manner consistent with the joint venture's purpose and Plaintiff's legitimate expectation of maintaining its 11.07 percent equity interest and sharing in JSAT's growth.

97.    Nantong Jiahe's actions in orchestrating the 2020 nationalization of JSAT, erasing Plaintiff's equity interest, and refusing to recognize or compensate Plaintiff's intellectual property contributions, even after Hong Kong arbitration confirmed valuation of the MyCar IP, constitute bad-faith performance and enforcement of the JVA and related agreements.

98.    By acting in bad faith, Nantong Jiahe deprived Plaintiff of the central benefit of the bargain: a secure equity interest in a major automotive manufacturer built on Plaintiff's technology and capital, with a fair share of profits and appreciation.

99.    As a direct and proximate result, Plaintiff has suffered substantial damages as set forth above and is entitled to recover such damages as are available under the implied covenant doctrine, in addition to contractual and quasi-contractual relief.

**COUNT VII**

**CONVERSION**
**(Against Both Defendants)**

100.  All previous paragraphs are incorporated herein.

101.  Under Virginia common law, conversion is "any wrongful exercise or assumption of authority … over another's goods, depriving him of their possession" or any act of dominion wrongfully exerted over property inconsistent with, or in denial of, the owner's rights. Mackey v. McDannald, 842 S.E.2d 379, 387 (2020).

102.  To establish a claim of conversion of an intangible item, a plaintiff must have both a property interest in and "be entitled to immediate possession" of the documented intangible property. Id.

103.  Plaintiff, through its acquisition of WMI and GTA's assets, owned (a) Rugao GreenTech and its 11.07 percent equity interest in JSAT; and (b) the underlying EV intellectual property that WMI had originally contributed to JSAT as capital.

104.  The arbitral decision documenting WMI's intellectual property contribution and equity share is attached to this complaint as Exhibit A.

105.  Defendants wrongfully exercised dominion and control over Plaintiff's 11.07 percent equity interest by effectively nullifying or erasing the interest, excluding Plaintiff from corporate governance and economic rights, and treating JSAT as if wholly owned and controlled by state-owned stakeholders.

106.  Defendants likewise exercised dominion over Plaintiff's technology by continuing to incorporate the MyCar EV and other WMI technology into JSAT's operations and assets, without recognizing Plaintiff's ownership or paying any compensation for the exploitation of that technology.

22

107.    Defendants' actions were inconsistent with Plaintiff's rights as equity holder and intellectual property owner and were undertaken without Plaintiff's consent, particularly during a time when Plaintiff's representatives could not physically access JSAT due to Covid-19 travel restrictions.

108.    Defendants' conversion of Plaintiff's equity and technology has proximately caused Plaintiff to lose at least 476.47 million U.S. dollars in equity value and additional intangible value associated with its intellectual property and future business opportunities, for which Plaintiff seeks compensatory damages and such further relief as this Court deems just.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Encore Wealth Investments Limited respectfully requests that this Court enter judgment in its favor and against Defendants JSAT and Nantong Jiahe as follows:

a.    On Count I (Unjust Enrichment), awarding Plaintiff restitution in an amount equal to 476.47 million dollars (representing 11.07 percent of JSAT's 30 billion Chinese Yuan valuation at the time of takeover), or alternatively 159 million dollars (11.07 percent of JSAT's 10 billion Chinese Yuan capitalization), plus pre- and post-judgment interest.

b.    On Count II (Breach of the Defense of Trade Secrets Act), awarding Plaintiff double its compensatory damages as permitted by statute in the amount of 952.94 million dollars, reasonable attorney's fees as permitted by statute, and pre- and post-judgment interest, or in the alternative, awarding Plaintiff exemplary damages not exceeding 952.94 million dollars;

c.    On Count III (Equitable Estoppel), in the alternative and to the extent necessary, enforcing

Defendants' promises and estopping Defendants from denying Plaintiff's equity and restitutionary rights, and granting monetary and equitable relief sufficient to prevent injustice;

d. On Count IV (Breach of Fiduciary Duty), awarding Plaintiff compensatory damages in the amount of 476.47 million dollars, plus pre- and post-judgment interest;

e. On Count V (Breach of Contract), awarding Plaintiff compensatory damages in the amount of 476.47 million dollars, plus pre- and post-judgment interest;

f. On Count VI (Breach of Implied Covenant of Good Faith and Fair Dealing), awarding Plaintiff compensatory damages in the amount of 476.47 million dollars, plus pre- and post-judgment interest;

g. On Count VII (Conversion), awarding Plaintiff compensatory damages in the amount of 476.47 million dollars, plus pre- and post-judgment interest;

h. Awarding Plaintiff its reasonable attorneys' fees and costs to the fullest extent permitted by applicable law;

i. Punitive damages in the amount of 350,000.00 dollars;

j. Granting such declaratory and injunctive relief as the Court deems just and proper, enjoining Defendants from further dispossessing or dissipating the value of Plaintiff's intellectual property; and

k. Granting any other and further relief this Court deems just and proper.

Respectfully submitted,
ENCORE WEALTH INVESSTMENTS,
By counsel

MAHDAVI, BACON, HALFHILL, & YOUNG, PLLC


By:     _____/s/ James T. Bacon_____ _____
        James T. Bacon, Esq. (VSB# 22146)
        11350 Random Hills Rd.
        Suite 700
        Fairfax, VA 22030
        703-352-1300
        703-352-1301 (fax)
        jbacon@mbhylaw.com